IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TONDOCHAN HATCHETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 CV 2133 |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff Tondochan L. Hatchett ("claimant" or "Hatchett") filed this action seeking

judicial review of the final decision of the Commissioner of Social Security

("Commissioner"). The Commissioner denied claimant's request for Supplemental

Security Income and Disability Insurance Benefits. We have jurisdiction to review this

matter pursuant 42 U.S.C. §§ 405(g) and 1383(c).[1] For the reasons set forth below,

Hatchett's motion for summary judgment [23] is granted in part and denied in part.

## I.    BACKGROUND

### A.    Procedural History

Claimant filed an application for Disability Insurance Benefits ("DIB") on April 18,

2006. (R. 181-86.) Hatchett's application was initially denied on August 29, 2006 and,

following a timely request for reconsideration, again denied on January 19, 2007. (R.

102-07, 112, 113-118.) Hatchett requested a hearing, which Administrative Law Judge

---

[1] The relevant CFRs addressing Disability Insurance Benefits and Supplemental Security
Income are identical. References will be made to the Disability Insurance Benefits regulations,
found at 20 C.F.R. §§ 404.1500-404.1599.

("ALJ") Paul R. Armstrong held on March 11, 2009.  (R. 33.)  ALJ Armstrong denied

Hatchett's request for benefits on April 16, 2009.  (R. 11-24.)  The Appeals Council

subsequently denied Hatchett's request for review, leaving ALJ Armstrong's decision as

the final decision of the Commissioner.  (R. 1-3); *Estok v. Apfel*, 152 F.3d 636, 637 (7th

Cir. 1998).  Hatchett subsequently filed this action in the District Court, and the parties

consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).

### B.    Medical Evidence

Claimant was seen by Laura Steinberg, a psychiatrist at North East Ohio Health

Services in Cleveland, Ohio between February 27 and September 27, 2006.  (R. 636-

666, 813-914.)  At the initial counseling session, Dr. Steinberg noted that claimant was

suffering from bipolar disorder without specifying the type.  (R. 664.)  On March 20,

2006, claimant reported that her prescribed lithium was making her feel "too low."  (R.

656.)  During an April 27, 2006 session, Dr. Steinberg noted that claimant had quit using

marijuana, and that she was taking her lithium again after a period of noncompliance.

(R. 654.)  On May 11, 2006, Dr. Steinberg noted claimant was not taking a prescribed

sleep-aid because it made her feel sluggish and hungover.  (R. 647.)  During a May 17,

2006 exam, Dr. Steinberg noted that claimant reported suicidal thoughts, but no intent

to act upon them because of her daughter.  (R. 645.)  On May 24, 2006, claimant

reported that her thoughts were "running fast," and that at her prescribed medication

times, she often created excuses or began other tasks and forgot to take it.  (R. 639.)

Additionally, she stated that while one medication put her "in a peaceful mood," it also

made her feel overly sedated and she could not tolerate that.  (*Id.*)  On May 31, 2006,

Dr. Steinberg noted claimant was confused by her medication dosage and taking less

2

than the prescribed amount, but otherwise complying with her medication. (R. 636.)

Following a November 9, 2005 car accident, claimant saw psychiatrist Patricia Martin at her Cleveland Heights, Ohio office on April 4, 2006, at the request of claimant's insurance company. (R. 627.) Claimant reported symptoms of nervousness and jitteriness following the accident. (*Id.*) During this examination, claimant stated that the accident had been extremely distressing to her. (R. 628.) Claimant apparently also reported that, after about a month without the use of her car, claimant was discharged from her job due to "productivity and attendance" issues. (*Id.*) Claimant told Dr. Martin that her activities of daily living had deteriorated markedly since the accident and that she had little energy, an irritable attitude, and would often cry. (R. 631.) Following the examination, Dr. Martin received materials from Dr. Steinberg which, according to Dr. Martin, did not mention that claimant had attributed her emotional or psychological symptoms to the accident when she saw Dr. Steinberg in February 2006 for an upsurge of depression. (R. 627.) Dr. Martin's report to the insurance company concluded that the accident had an indirect impact on claimant, in that it caused her to lose a job that was important to her, which in turn Dr. Martin opined was the main cause of claimant becoming "nervous and jittery." (R. 633.) Dr. Martin diagnosed claimant with "Bipolar Disorder, current episode Depressed, moderately severe," and found her Global Assessment of Functioning Scale ("GAF") score was 50. (*Id.*)

At the recommendation of Dr. Steinberg and claimant's case manager, claimant checked into the University Hospitals of Cleveland on July 28, 2006. (R. 745.) She was examined by emergency room physician Cristinel Coconcea. (*Id.*) Claimant showed suicidal and homicidal ideation when she was admitted, although that thought content

3

was apparently not present on her discharged three days later.  (R. 746, 747.)

State examiner and psychologist Herschel Pickholtz examined claimant in Beachwood, Ohio on August 9, 2006.  (R. 760.)  Claimant reported that with her current medications, her depression had improved to some degree, but that she still had problems with mood swings.  (R. 761.)  Dr. Pickholtz' August 20, 2006 report indicates claimant stated her (unnamed) doctor told claimant she was having delusions and hallucinations and had a paranoid disorder with episodes of grandiosity.  (*Id.*)  Claimant also asserted that she was hearing voices that instructed her to kill her mother.  (*Id.*)  Dr. Pickholtz wrote claimant reported she had some periods where she felt homicidal and suicidal, but that she did not feel that way at the present time.  (R. 764.)  Dr. Pickholtz described claimant's overall levels of depression as moderate at that time and stated he observed no signs of mood swings or hyperactivity, but noted that she was slightly lethargic.  (R. 762, 763.)  He wrote that claimant's then-current levels of intellectual functioning were within the average to low average range.  (R. 763.)  Dr. Pickholtz diagnosed claimant with bipolar affective disorder, "mild to moderate, without any psychotic processing and no signs of any manic activity with her major problem related to her depression, which appeared to be mild to moderate."  (R. 765.)  He also found she had "mixed polysubstance dependency allegedly in remission as of recently" and a GAF of 60 to 65, and noted she was a victim of sexual molestation.  (*Id.*)

On August 25, 2006, state medical consultant Leslie Rudy, Ph.D., completed a mental residual functional capacity ("RFC") assessment and a "psychiatric review technique" form regarding claimant.  (R. 768-71, 772-85.)  Dr. Rudy diagnosed claimant with bipolar affective disorder and mixed polysubstance dependency in (reported)

remission.  (R. 775, 779.)  Among other things, Dr. Rudy concluded that claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions, and in her abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 768, 769.)   Dr. Rudy also opined that claimant was moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting.  (R. 769.)  Dr. Rudy found claimant had a mild to moderate limitation with handling the stresses and pressures of work, and that she would be able to work in an environment where there was little production demand and little interaction with others.  (R. 770.)  Dr. Rudy also concluded that claimant had mild restrictions in activities of daily living and difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and one or two episodes of decompensation, each of extended duration.  (R. 782.)

On August 29, 2006, state medical consultant Gary Hinzman, M.D., completed a physical RFC assessment of claimant.  (R. 786-93.)  Among other things, he found that she had a decreased range of motion in her knees, shoulders, and hips bilaterally, a history of uncontrolled high blood pressure, and chest pain related to stress and anxiety.  (R. 787.)  He concluded that she could occasionally lift or carry up to 20 pounds, could frequently lift or carry 10 pounds, and had various postural limitations.  (R. 787, 788.)

Between October 2006 and February 2008, claimant regularly saw two psychiatrists, Khursheed Zia and Mercy Sabapathypillai, both of Bootheel Counseling

Services in Sikeston, Missouri.  (R. 916-928, 931-1003.)  During that period, they prescribed claimant with Lithium, Eskalith, Klonopin, Trazadone, and Lamacitol.  (R. 1003.)  On March 9, 2007, Dr. Zia noted that, to the best of her knowledge, claimant had been compliant with her medications and appointments, and her current diagnoses were bipolar I disorder, depressed type with psychotic features, and marijuana and alcohol abuse, both in full sustained remission.  (R. 955.)  On August 31, 2007, Dr. Sabapathypillai wrote an open note stating claimant was unable to be gainfully employed for the next three months "[d]ue to her mental condition and medication adjustment."  (R. 1002.)  Claimant was discharged from Bootheel Counseling Services on February 20, 2008 as a result of her moving away from the area.  (R. 931.)  The discharge summary noted that she continued to report symptoms of mood swings, irritability, and depression that "appeared to improve with medications compliance," but that she also "reported periods of noncompliance throughout treatment."  (R. 932.)  She was advised to follow up with mental and other health care in her new location.  (*Id.*)

Between October 2007 and February 2009, Marshall James, a primary care physician, and Nathaniel Isaac, Psy.D, both of the Family Christian Health Center in Harvey, Illinois, treated claimant.  (R. 1022-1036, 1062-67, 1071-76.)  During that period, they repeatedly noted that claimant had bipolar disorder and hypertension.  (*E.g.,* R. 1025, 1026, 1027, 1033.)  On April 4, 2008, Dr. Isaac completed a "Mental Impairment Questionnaire."  (R. 1038-41.)  He diagnosed claimant with bipolar disorder and found a GAF of between 51 and 60.  (R. 1038.)  According to his report, claimant exhibited symptoms including mood disturbance, emotional lability, difficulty thinking or concentrating, suicidal ideation, social withdrawal, decreased energy, manic syndrome,

6

hostility, and irritability.  (*Id.*)  Dr. Isaac noted that he expected claimant to be absent from work more than three times a month due to her impairment.  (R. 1039.)

Dr. Isaac indicted that a chart entitled "Mental Abilities and Aptitude Needed to do Unskilled Work" was "not assessed."  (R. 1040.)  However, he did indicate the degree to which he found certain of claimant's functions limited as a result of her mental impairments.  (R. 1041.)  He assessed claimant as having marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace, and repeated (3 or more) episodes of deterioration or decompensation in work, resulting in exacerbation of symptoms.  (*Id.*)

On February 19, 2008, claimant was admitted to Ingalls Memorial Hospital in Harvey, Illinois.  (R. 1005.)  The next day, attending physician Lester Hockenberry noted she had been suffering from hypomania, that her "tox is positive for marijuana," and that she "will have outpatient followup."  (R. 1006.)  Following hospitalization, claimant continued to see Dr. James, as noted above.

### C.    Claimant's Testimony

At the time of the March 11, 2009 hearing, the claimant was 35 years old. Claimant testified that she had moved to Illinois from Missouri because of relationship problems, stating that if she remained in Missouri any longer, "somebody was going to be dead."  (R. 38.)  She asserted that she needed a job to support her then 16-year-old daughter, but that she had to stop working because she "was just stressed out to the point where [she] couldn't take it," which resulted in eviction from the home where she had been living.  (R. 38-39.)  Claimant testified the situation resulted in a great deal of anger and at least one physical altercation with her daughter.  (R. 39.)  She also

described some of the physical, sexual, and verbal abuse she had endured. (R. 39-42.) Claimant testified she joined the military "to escape all that," but was "chaptered out" after less than six weeks for an "inability to adapt," after a drill sergeant "stuck his hand down [her] pants and [she] just – [she] flipped out." (R. 42.) She stated that her usual experience at past jobs would be exemplary performance for the first month or so, until "a switch turns" and she is overcome by concentration and attention problems. (*Id.*)

Claimant testified that the counselors she visits are "not going to cure [her]," and that she felt that her medication did more harm than good. (R. 42.) She stated that she relived "traumatic experiences" – including daily images of past verbal, physical, and sexual abuse – over and over in her head, and that she was suicidal. (R. 39, 41, 45, 47.) She testified that if not for her daughter, she "would have blown my head off by now." (R. 47.) Claimant explained that she had also been on sleep aid medication, but that she did not currently take it because even large quantities would not help her sleep. (R. 52.) She claimed that she could not sleep because her mind "won't stop racing" and she "won't stop thinking." (*Id.*) She stated that "[i]t's taken everything in [her] not to pick up a drink because [she] know[s] the effect." (R. 53.) Claimant disputed some of the statements in and the ALJ's characterization of her medical records regarding her marijuana and alcohol use. (R. 63-67.)

At one point during the hearing, claimant's attorney suggested that some of her past relevant work was competitive employment because it was done on rare occurrences and at claimant's own pace. (R. 58, 60-61.) Claimant agreed that the majority of her income from that work came from producing one or two obituaries. (R. 61.) The ALJ questioned claimant on her noncompliance with medication and claimant

again reiterated her feeling that they did "more harm than good," stating "I was hallucinating. I was seeing things. It would impair me." (R. 68-69.) When the ALJ suggested an attendance problem caused claimant to lose her last job, claimant responded that she would show up, but would end up crying and being unproductive. (R. 79-80.) Near the end of the hearing, following the vocational expert's testimony, claimant exited the room for the remainder of the hearing. (R. 91-92.)

### D. Medical Expert Testimony

The ALJ and claimant's attorney questioned medical expert Larry Kravitz, a psychologist, at the hearing. Dr. Kravitz described claimant's history of bipolar disorder with psychotic features. (R. 63.) He stated that claimant's treatment notes highlighted racing thoughts, irritability, paranoid ideation, hallucinations, slightly grandiose thinking, frequent episodes of crying, and hyper-manic episodes. (*Id.*) Dr. Kravitz also stated that claimant's medical records showed that she had a history of drug and alcohol abuse. (R. 63-64.) As noted above, the hearing transcript indicates some dispute regarding when claimant was in full sustained remission for alcohol and drug abuse. (R. 63-67.) Dr. Kravitz noted that although claimant had a history of substance abuse, there was no evidence of recent abuse, or, at the very least, that there was a lack of clarity regarding recent marijuana use. (R. 67.) He also noted that the record was large and he "could have missed" evidence regarding recent usage. (*Id.*) Dr. Kravitz also acknowledged that claimant had, at times, been noncompliant with her medications, especially Trazodone and Ambien, but that the medical records also showed periods of compliance, and that claimant's treatment record was a "mixed bag." (R. 63-64, 69.)

Dr. Kravitz also testified that although claimant presented intact thought

processes and reasonable memory capacities during her testimony at the hearing, there were numerous physicians' notes from 2006 through 2008 referencing the contrary symptoms he described earlier. (R. 73.) He reiterated that claimant had an "up and down record." (*Id.*) After claimant's attorney asked whether indicators such as mental status or notions of cognitive functioning excluded the possibility that claimant had serious bipolar disorder with psychotic features, Dr. Kravitz responded that they don't exclude it, but "[w]hat they suggest is at times she can manage it." (R. 74.) Dr. Kravitz stated that claimant had the ability to sustain work to "some degree," and that "the longer you have a record of these ups and downs and marginal functioning, the stronger the case that the individual just functions marginally overall." (R. 74-75.)

Upon further questioning by claimant's attorney, Dr. Kravitz said that claimant's presentation at the hearing was consistent with "both sides of what examiners say," and that her work history – the prevalence of short-lived employment and temporary jobs – was consistent with the record. (R. 75.) He repeatedly noted that the record contained a mixed picture of claimant's symptoms. (R. 75, 83, 85.) He also stated that determining claimant's residual functional capacity would be "a very difficult call in this case because [of] the same mixed picture in terms of the symptoms – you know, some presentations suggest more intact functioning." (R. 83.) He noted that Dr. Isaac had found claimant had marked impairment of functions "in all areas"[2] on April 2, 2008, and

---

[2] In so stating, Dr. Kravitz appears to have somewhat oversimplified Dr. Isaac's Mental Impairment Questionnaire. Dr. Isaac checked the questionnaire's box for "marked" when indicating his opinion of claimant's restrictions in activities of daily living and difficulties in maintaining social functioning. He checked the box for "frequent" with respect to claimant's deficiencies in concentration, persistence, or pace, and the box for "repeated" with respect to episodes of deterioration or decompensation. (R. 1041.)

"that then becomes inconsistent with Claimant's ability to be gainfully employed."  (R. 83.)  Dr. Kravitz also noted that claimant reported rarely going grocery shopping and that her housekeeping fluctuated with her mood while at the same time being employed and having several days off for "bad days."  (R. 84.)  Dr. Kravitz described this combination as "confusing" and said that it again raised the question of whether claimant could sustain work.  (R. 84.)  He testified that some notes indicated claimant had considered attending a day treatment center to help build activities of daily living, housekeeping, and hygiene skills, and that this usually indicated that someone might be struggling and fairly limited in ability.  (*Id.*)

Dr. Kravitz testified that given the "real mixed picture depending on what notes you read," it would be hard to predict the extent of claimant's abilities and functioning over the next twelve months.  (R. 85.)  Dr. Kravitz stated that his best recommendation would be to contact claimant's current psychologist and ask for detailed treatment notes to observe claimant's progress from session to session.  (R. 85-86.)  Claimant's attorney asked whether an individual with bipolar disorder, psychotic features, mood disturbances, emotional lability, somatization, unexplained organic disturbances, hostility, irritability, manic syndrome, and grandiosity might sometimes go off medication because of those issues.  (R. 90.)  Dr. Kravitz replied that was possible and again recommended getting a current report from claimant's treating physician.  (*Id.*)  Dr. Kravitz concluded that for an individual with mood swings, manic episodes, missed work, and temper outbursts, his greatest concern would be sustainability over an extended period of time in a competitive work environment.  (R. 95.)  When asked by claimant's attorney, Dr. Kravitz stated that he believed claimant seemed credible.  (*Id.*)

### E.     Vocational Expert Testimony

At the hearing, vocational expert Grace Geonforti testified about the capabilities of a hypothetical individual with the same two occupations as claimant previously held: administrative assistant and source specialist, both defined as having light levels of exertion.  (R. 87-88.)  The ALJ asked whether that hypothetical person, if limited to "simple, unskilled" work, that is, "low pressure work with no physical limitations," would be able to return to any past relevant work similar to claimant's work history.  (R. 88.)  Ms. Geonforti responded that this hypothetical would not be consistent with the past relevant work in question, as it was not simple and unskilled.  (*Id.*)  Ms. Geonforti testified that if a hypothetical person with a similar work background as claimant had the capacity to perform unskilled, simple work with no exertional limitations, she would recommend a position as an order clerk (3,500 jobs), phone order taker (4,000 jobs), office helper (40,000 jobs), or stock checker (2,500 jobs).  (R. 88-89.)  The ALJ also asked whether such an individual would be able to sustain employment if she periodically missed more than two days of work in a month.  (R. 89.)  Ms. Geonforti replied that it would be difficult to sustain competitive employment, as the Department of Labor's reported tolerances were 1.3 days off per month in the private sector and six days off per month in the public sector.  (*Id.*)  Ms. Geonforti also explained that if claimant was present at work every day, but her symptoms caused her to be off task for about fifteen minutes every hour, this pattern would also create difficulty maintaining competitive employment.  (*Id.*)

### F.     ALJ Armstrong's Statements at the Hearing

Early in the hearing, the ALJ questioned claimant's attorney regarding whether

claimant had had substantial gainful activity within the past year.  (R. 35-36.)  Claimant's

attorney acknowledged that she had, and that "we appreciate that" claimant did not

have twelve months without such activity.  (*Id.*)  The ALJ responded, "What do you

want?  Advice, opinion, or something?  I mean, what am I supposed to do?"  (R. 36.)

The attorney stated he or she had previously advised claimant "as to the limitations of

the system."[3]  (*Id.*)  The attorney also suggested that a prospective opinion could be

given if the evidence was compelling enough, to which the ALJ was noncommittal.  (*Id.*)

The hearing continued, with the ALJ questioning claimant.  At one point during

claimant's testimony, the ALJ stated that "you're probably not in a position where you're

going to qualify for disability at your age."  (R. 45.)  Toward the end of the hearing, the

ALJ commented:  "[Y]ou know, we've wasted an hour and a half on it.  We don't even

have 12 months on the thing, and we're thing to get an advisory opinion on something.

Counsel, you're going to need this time on a good case some day, and you're not going

to have it …. What I mean, ma'am is this – not is a case – I can't make a Decision in

your favor for at this time.  You're going to have to file again, and be off at least a year.

But there's nothing I can do on this case [sic]."  (R. 90-91.)  When the claimant

thereafter stated "I really need to go because this is not going to be a good day," the

ALJ responded, "Okay.  Well, I'm sorry, ma'am.  I didn't – I really – I'm trying to do the

best I can.  And I did want to talk to you because you had such a tough time.  But I told

you at the beginning there wasn't a lot, and counsel told you too."  (R. 91.)  Claimant

---

[3]  The hearing transcript does not reflect the name of the attorney representing claimant at the
hearing.  (*See* R. 31-97.)  However, it appears that claimant was not represented at that time by
her current counsel, Barry A. Schultz.

thereafter left the hearing, and her attorney continued to question the medical expert. (R. 94-95.) ALJ Armstrong again expressed his concerns regarding the ripeness of the case after claimant departed. (R. 93-94.) Claimant's attorney again acknowledged those concerns and that he had communicated them to claimant, and once again suggested that a prospective opinion could be given. (R. 94.) The ALJ reiterated his doubt as to the propriety of doing so. (*Id.*)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means evidence a reasonable person would "accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); s*ee also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm that decision. *Lopez*, 336 F.3d at 539 (citations omitted). While the ALJ need not

discuss every piece of evidence in the record, she "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). In other words, "the issue before this court is whether the ALJ's findings were supported by substantial evidence, not whether [claimant] is disabled." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

### B.    Analysis Under the Social Security Act

To qualify for disability benefits, a claimant must be found "disabled" under the Social Security Act (the "Act"). 42 U.S.C. § 423(a)(1)(E). A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ must consider the following five-step inquiry: (1) whether the claimant is presently employed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the

claimant's residual functional capacity leaves her unable to perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Armstrong followed this five-step analysis. At step one, he appears to have concluded that claimant had not engaged in substantial gainful activity as of the alleged onset date of September 12, 2003. (R. 16.)[4] At step two, the ALJ found that claimant had the following "severe" impairments: bipolar disorder and hypertension. (*Id.*) At step three, the ALJ concluded that the claimant did not have an impairment or combination of impairments that meets or medically equals the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19.) The ALJ found that claimant had the RFC to perform a full range of work at all exertional levels, but with the nonexertional limitation of no more than simple, unskilled work. (R. 20.) The ALJ determined that claimant's medically determinable impairments could cause her alleged symptoms, but that claimant's statements regarding the symptoms were not credible as they were inconsistent with his RFC. (R. 21.) The ALJ found that claimant was not compliant with

[4] Notably, the ALJ's opinion is somewhat contradictory on this issue. ALJ Armstrong wrote in a heading that he found no substantial gainful activity at step one. (R. 16.) However, in the following paragraph, he wrote that some of claimant's wages "were possibly SGA, but a conclusion cannot be reached with evidence of record, and I do not want to delay the case to get additional evidence." (*Id.*) Not surprisingly, the parties dispute the propriety and impact of the ALJ's written statements regarding step one. Because we are remanding the case on other grounds, we need not address this issue, other than to respectfully direct the ALJ to conduct a full and appropriate analysis at step one on remand.

her medication, that treatment had improved her condition, that she left her last job for non-medical reasons, and that no evidence supported her assertion that she was suicidal. (*Id.*) At step four, the ALJ found that claimant was a younger individual between 18 and 44 years old; that she had a high school education and was able to communicate in English; that she was unable to perform any past relevant work; and that she had no transferable skills within her current RFC. (R. 21-22.) At step five, the ALJ found that, considering claimant's age, education, work experience, and RFC, and the vocational expert's testimony, jobs existed in significant numbers in the national economy that claimant could perform. (R. 22-23.) The ALJ concluded claimant had not been disabled from September 12, 2003 through the date of his decision. (R. 23.)

## III. ANALYSIS

Hatchett's motion takes issue with several aspects of the ALJ's opinion. First, Hatchett argues that the ALJ ignored the opinion of Dr. Isaac, claimant's treating psychologist, and failed to give it proper weight. Second, claimant argues that the ALJ failed to properly determine her credibility. Third, Hatchett contends that the ALJ's RFC determination was insufficient as a matter of law. Finally, Hatchett argues that the ALJ's bias – as demonstrated through comments he made at the hearing – warrants remand for further proceedings before a different ALJ. As set forth below, we conclude that the ALJ's decision was flawed in several important respects, and as a result, remand is required. However, we also find that remand to a new ALJ is not warranted here.

### A. The ALJ Mishandled the Opinion of Claimant's Treating Psychologist.

The Code of Federal Regulations sets forth requirements for considering a

treating physician's opinion.  *See* 20 C.F.R. § 404.1527.  ALJs must consider medical

opinions within the record together with additional relevant evidence that they receive.

20 C.F.R. § 404.1527(b)-(d).  Controlling weight is generally given to opinions authored

by an individual who has treated or examined the claimant over one who has not.  20

C.F.R. § 404.1527(d).  That is because a treating physician is more likely to provide a

"detailed longitudinal picture" of a claimant's medical impairments.  *Id.*  Controlling

weight is given where the treating physician's opinion is well-supported by substantial

evidence in the record.  *Id.*  If an ALJ does not give it controlling weight, he or she is

required to examine the length and frequency of the treatment relationship, the

frequency of examination, and the nature and extent of the treatment relationship and

specialization, and give good reasons for the weight she or he affords the opinion.  *Id.*

Here, the ALJ did not follow those requirements.  While the background section

of his opinion has an oblique reference to Dr. Isaac's report, the ALJ failed to

appropriately address Dr. Isaac's conclusions in the analysis portion of his opinion.  The

ALJ's opinion contains no discussion as to why he chose not to give Dr. Isaac's opinion

controlling weight, nor does it mention what weight, if any, he gave Dr. Isaac's report in

accordance with 20 C.F.R. § 404.1527(d)(1)-(6).  Further, while the ALJ wrote that Dr.

Isaac never assessed claimant's ability to do unskilled work, Dr. Isaac's report in fact

states that claimant displayed "marked" limitations in daily living activities and social

functioning abilities, "frequent" deficiencies of concentration, persistence, or pace, and

"repeated (three or more)" episodes of deterioration or decompensation in work, and

would on average be absent from work more than three times a month.  (Indeed, the

medical expert noted several of those aspects of Dr. Isaac's report at the hearing.)  As a

result, the ALJ should also have considered those aspects of Dr. Isaac's report and discussed them in his opinion, as they constitute evidence favorable to claimant and contrary to the ALJ's conclusion.  *Indoranto*, 374 F.3d at 474.

### B.    The ALJ Failed to Properly Make a Credibility Determination.

Because the ALJ is in a superior position to judge the credibility of a claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (*quoting Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990)).  The ALJ's credibility determination is entitled to "special deference."  *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (*citing Powers*, 207 F.3d at 435).  However, the ALJ is still required to articulate his reasoning and discuss or distinguish relevant contrary evidence.  *Clifford*, 227 F.3d at 870.  "Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.  Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence."  *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted).  The ALJ must also follow the requirements of Social Security Ruling ("SSR") 96-7p.  *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  Among other things, SSR 96-7p requires ALJs to consider the entire case record when evaluating an individual's credibility.  1996 WL 374186, at *4 (S.S.A. July 2, 1996).

Here, the ALJ failed in several respects to make a proper credibility determination.  First, the ALJ did not evaluate claimant's credibility before assessing her RFC.  Instead, he stated in a conclusory fashion that her statements regarding her symptoms were not credible to the extent that they were inconsistent with his RFC

determination. (R. 21.) The Seventh Circuit has expressly barred such a "post-hoc" credibility determination. *Brindisi*, 315 F.3d at 787-88 (holding that ALJ "turn[ed] the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the Brindisis' credibility as an initial matter in order to come to a decision on the merits.").

Second, the limited credibility analysis undertaken by the ALJ was deficient. Among other things, the ALJ did not discuss the reasons proffered by claimant that might explain her failure to take her prescribed medication, or the effect of mental illness on her compliance with treatment. *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010); *see also* SSR 96-7p, 1996 WL 374186, at *3 (adjudicator must consider "the type, dosage, effectiveness, and side-effects of any medication the individual takes or has taken to alleviate pain or other symptoms"). Here, the ALJ emphasized physician notes stating that Hatchett was repeatedly noncompliant with her medications. However, Hatchett reported to several physicians, and testified at the hearing, that she discontinued her medication at various times because of side effects, including making her feel "too low" or "hungover." Further, the medical expert testified that a person with bipolar disorder could stop taking their medications due to their illness. The ALJ erred in failing to consider that evidence as part of his credibility determination. *See id.*

Additionally, the ALJ's conclusions that "[p]rescribed treatment has improved condition" and "claimant has experienced some periods of improvement" (R. 21) do not account for the episodic nature of bipolar disorder or recognize that some periods of improvement are not inconsistent with the disorder. The ALJ's failure to explicitly consider those factors in the context of his conclusion that claimant is capable of

sustaining employment over time also constitutes error. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (ALJ erred in relying on hopeful remarks in treating physician's notes and ignoring "chronic" nature of bipolar disorder, where an afflicted person is "likely to have better days and worse days").

Further, the ALJ incorrectly wrote that while claimant testified at the hearing that she was suicidal, "there is no evidence of this allegation, and counsel did not produce any medical documentation for verification." (R. 21.) In fact, the record contains multiple references to claimant being suicidal. For example, Dr. Isaac's report noted claimant was suicidal on April 2, 2008, and claimant evidently displayed suicidal ideation during counseling sessions in January 2005, May 2006, and while admitted to the University Hospitals of Cleveland. Strangely, the ALJ noted as much in earlier portions of his opinion. (R. 17, 18, 19.) However, he erred by failing to analyze that evidence or discuss why he rejected it in concluding claimant lacked credibility. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) ("The ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability.").

Further, while the ALJ concluded that claimant left her last job for "non-medical reasons," in that she "was not productive and was fired" (R. 21), he failed to articulate how he came to that conclusion. That failure is particularly troublesome in light of claimant's testimony that she was fired for productivity reasons due to stress and episodes of crying, conditions potentially attributable to her bipolar disorder. (R. 78-79.)[5] Finally, the ALJ improperly failed to analyze claimant's complaints of fatigue.

---

[5] Other contrary evidence may also exist in the form of a letter, apparently from Dr. Steinberg, refuting Dr. Martin's assertion that claimant lost her job because she lacked transportation. (R.

Again, while his opinion noted claimant's fatigue complaints in summarizing various medical records (R. 17), he did not analyze that evidence.  Among other things, the ALJ did not explain whether he found claimant's fatigue complaints credible (or not).  Nor did he account for those complaints in connection with his RFC finding that claimant had no exertional limitations.  Those failures also warrant remand.  *E.g.*, *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation").

## C.    The ALJ's RFC Determination Was Deficient.

A claimant's RFC must be based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family.  20 C.F.R. § 404.1545(a)(3).  In making that determination, the ALJ must decide which treating and examining doctors' opinions should receive weight, and explain the reasons for that finding.  20 C.F.R. § 404.1527(d), (f).  Notably, "an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."  *Clifford*, 227 F.3d at 870; *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings.").  Additionally, when determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe."  20 C.F.R. § 404.1545(a)(2), (b), (c); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  Mental limitations must be part of the RFC assessment, because "[a] limited ability to carry out certain mental activities, such as

_____

79.)  We have been unable to locate such a letter in the record.  While the ALJ appears to have acknowledged seeing that letter during the hearing (R. 78-79), his opinion did not discuss it.

limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. § 404.1545(c). Finally, the ALJ's RFC assessment must be based on all the relevant record evidence, and must contain a narrative discussion describing how the evidence supports the ALJ's conclusions. SSR 96-8p, 1996 WL 374184, at **5, 7 (S.S.A. July 2, 1996); *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here, the ALJ concluded that Hatchett had mild difficulties in social functioning and moderate difficulties in concentration, persistence, and pace. (R. 19.) He also concluded claimant had the RFC to perform a full range of work at all exertional levels, and found that she had a nonexertional limitation to no more than simple unskilled work. (R. 20.) The ALJ's determination is problematic in a number of respects.

First, it is unclear what supporting medical evidence the ALJ relied upon in coming to his conclusion regarding claimant's RFC. The ALJ rejected the state agency consultant Dr. Hinzman's opinion that claimant could do light-level work. (R. 21.) However, in doing so, the ALJ did not adequately specify the evidence that affirmatively and directly supported his conclusion that claimant had no exertional limitations. Further, the ALJ rejected the opinion of state agency consultant Dr. Rudy – who found claimant had moderate limitations in various mental RFC categories – because that opinion "did not have the benefit of medical evidence submitted subsequent to that decision namely therapeutic notes indicating improvement." (*Id.*) However, the ALJ did not actually cite any specific subsequent records that supported his rejection of Dr. Rudy's opinion (or, as noted below, acknowledge other subsequent records that appear

23

to support it). Those failures raise the impermissible possibility that the ALJ "played doctor" and made his own independent medical determination of what claimant could do. *Rohan*, 98 F.3d at 970. As a result, remand is required for the ALJ to fully articulate the reasons supporting his RFC determination and ensure that determination is properly supported by specific medical evidence. SSR 96-8p; *Briscoe*, 425 F.3d at 352.

Second, the ALJ failed to discuss – much less explain his rejection of – important evidence contrary to his RFC assessment. For example, claimant's treating psychologist Dr. Isaac concluded that claimant had marked restrictions in activities of daily living and difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace, and repeated episodes of deterioration or decompensation in work. He also estimated she would miss work more than three times a month. However, as discussed above, the ALJ did not analyze Dr. Isaac's report in any way or explain why he rejected Dr. Isaac's conclusions as to claimant's mental limitations. That violated SSR 96-8p, which provides that medical opinions from treating sources about the nature and severity of an individual's impairments are entitled to "special significance and may be entitled to controlling weight," and requires the adjudicator to explain why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. 1996 WL 374184, at *7.

Further, the ALJ did not discuss the medical expert's testimony and other evidence that, given claimant's varied symptoms, including her difficulties in concentrating, focusing, and getting along with others, she might not be able to sustain employment over time. Indeed, the medical expert acknowledged that making a RFC determination would be a "very difficult call" because of the mixed record of claimant's

24

symptoms, and the ALJ himself concluded that claimant had mild difficulties in social functioning. Yet, the ALJ did not place any limitation – other than to simple unskilled work – on claimant's RFC, nor did he confront the evidence contradicting his RFC determination and discuss why he rejected it. Those failures warrant remand. SSR 96-8p, 1996 WL 374184, at *2 ("RFC is assessed … based on all of the relevant evidence in the case record, including … any 'medical source statements' … submitted by an individual's treating source or other acceptable medical sources."); *Dixon*, 270 F.3d at 1176 (ALJ must build an accurate and logical bridge from the evidence to his conclusion); *Indoranto*, 374 F.3d at 474 (ALJ must confront the evidence that does not support his conclusion and explain why it was rejected); *Diaz*, 55 F.3d at 307 (ALJ may not select and discuss only that evidence that favors his ultimate conclusion).

Third, the ALJ erred in not discussing claimant's complaints of fatigue in connection with his RFC determination. SSR 96-8p states that the RFC assessment must "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms," and must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." 1996 WL 374184, at *7. Further, SSR 96-8p expressly notes that "a mental impairment may cause fatigue or hysterical paralysis." *Id.* at *6. As a result, the ALJ erred in failing to discuss claimant's fatigue complaints when coming to the contrary conclusion that claimant had no exertional limitations.

Finally, the ALJ's RFC determination, along with the hypothetical questions he posed to the vocational expert, did not account for the ALJ's own conclusions that claimant had "severe" impairments of bipolar disorder and hypertension as well as

25

moderate difficulties in concentration, persistence, and pace. (R. 16, 19.) The ALJ's attempt to "capture" those of Hatchett's problems he acknowledged by limiting her RFC to "simple unskilled work" (R. 20) fails to meet his obligation to build an accurate and logical bridge from the evidence to his conclusion so that we, as a reviewing court, may assess the validity of his findings and afford claimant meaningful judicial review. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). Further, "[w]hen an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). As noted above, the ALJ's RFC determination limited claimant to simple unskilled work. However, the Seventh Circuit has repeatedly rejected an ALJ's attempt to account for mental impairments by restricting hypotheticals to "simple tasks." *Stewart,* 561 F.3d at 684-85 (*citing, inter alia, Craft*, 539 F.3d at 677-78)). Indeed, the Social Security Administration has explicitly rejected such attempts. *See* SSR 85-15, 1985 WL 56857, at *6 (S.S.A. 1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job.").[6] As a result, the ALJ's hypothetical to the vocational expert was "fundamentally flawed" and remand is required. *Young*, 362 F.3d at 1004-05.

---

[6] The Commissioner argues that the ALJ's further explanation of his hypothetical to the vocational expert as limiting claimant to "low pressure" work with no physical limitations (R. 88) constituted "alternative phrasing" recognized as acceptable by the Seventh Circuit in *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). We disagree. Here, the alternative phrasing did not clearly or specifically exclude the tasks that someone with claimant's alleged limitations would be unable to perform, as *O'Connor-Spinner* requires. *Id.* at 619-20.

**D.    Remand to a New ALJ is Not Warranted.**

As discussed above, various issues warrant remand of this matter.  On remand, Hatchett requests that a different ALJ be assigned to this case, arguing that ALJ Armstrong's comments during the hearing show he was determined to deny her benefits and as a result, she did not receive a full and fair hearing.

Contrary to claimant's implication, this Court has no general power to order that a case be decided by a different ALJ upon remand.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996) (*citing Travis v. Sullivan*, 985 F.2d 919, 923-24 (7th Cir. 1993)).  Instead, the court will require a new ALJ on remand only if the original ALJ "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."  *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007) (*quoting Liteky v. United States*, 510 U.S. 540, 556 (1994).  However, in some instances, the court may recommend that the Social Security Administration assign a new ALJ on remand.  *See, e.g., Sarchet*, 78 F.3d at 309 (making such a recommendation after concluding that "[t]he tone of the administrative law judge's opinion suggests that she may have an unshakable commitment to the denial of this applicant's claim.").

Here, while some of the ALJ's comments regarding the ripeness of the case were unnecessary and his expressions of frustration may have upset claimant to the point of her leaving the hearing, we cannot conclude that the ALJ exhibited the bias necessary to either require remand to a new ALJ or a recommendation that a new ALJ be assigned.  ALJ Armstrong did not create a "coercive" environment "shameful in its atmosphere of alternating indifference, personal musings, impatience and condescension" for the claimant, *cf. Ventura v. Shalala*, 55 F.3d 900, 903, 905 (3d Cir.

1995), nor did his comments or opinion reflect an "unshakeable commitment" to denial of claimant's application, *cf. Sarchet*, 78 F.3d at 309. In fact, while the ALJ expressed doubts regarding the ripeness of claimant's case given the possible existence of substantial gainful activity within the past year, he apparently spent over 90 minutes hearing all of the evidence sought to be presented by claimant and her attorney, and ultimately rendered a decision on the merits of the case. Further, it is clear from the hearing transcript that claimant's attorney at the time shared the ALJ's ripeness concerns, and had communicated as much to claimant.

As a result, we will not order or recommend that this matter be remanded to a different ALJ. On remand, we anticipate that ALJ Armstrong will give due and appropriate consideration to all aspects of claimant's application and follow the applicable authorities when reevaluating it.

## IV.    CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment [23] is granted in part and denied in part. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated: August 31, 2011